**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **PEABODY & COMPANY LLC,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**RODERICK WAYNE, JR. p/k/a RODDY RICCH; SAMUEL GLOADE p/k/a 30 ROC; LAMAR ADARIUS MORAGNE; AQEEL QADIR TATE; KHIRYE TYLER, LARRANCE LEVAR DOPSON; BLUE NIKE PUBLISHING LLC; PEERMUSIC III, LTD.; KOBALT MUSIC PUBLISHING AMERICA, INC.; VOLUME VENTURES PUBLISHING, LLC; WARNER-TAMERLANE PUBLISHING CORORPATION; ATLANTIC RECORDING CORPORATION d/b/a ATLANTIC RECORDS,**<br><br>    **Defendants.** | **Case No. 1:22-cv-10316 (AT)**<br><br>**FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

---

<u>**FIRST AMENDED COMPLAINT**</u>

1.    This is an action for willful copyright infringement in which Plaintiff Peabody & Company, LLC ("Plaintiff"), by and through undersigned counsel, bring this First Amended Complaint against Roderick Wayne, Jr., p/k/a Roddy Ricch, Samuel Gloade, Lamar Adarius Moragne, Aqeel Qadir Tate, Khirye Taylor, Blue Nike Publishing, PeerMusic III, Ltd, Songs of Kobalt Music Publishing, Volume Ventures Publishing, LLC, Warner-Tamerlane Publishing Corp., Atlantic Recording Corporation d/b/a Atlantic Records (collectively, "Defendants", each individually a "Defendant"). Plaintiff's claims involve intentional infringement of a copyright in the musical composition of Plaintiff's original work titled "COME ON DOWN (Get your Head

Out of the Clouds)" (the "Infringed Work" or the "Original Work")(hereinafter "COME ON DOWN") by Defendants of the song "THE BOX" (the "Infringing Work").

**PARTIES**

2.      Plaintiff Peabody & Company LLC ("Peabody") is a California limited liability company owned by Joel Perry and Melodye Perry, with its principal place of business located at 567 W. Jackman St., Lancaster, California 93534 and is the owner of the musical composition for "COME ON DOWN".

3.      Defendant Roderick Wayne, Jr. p/k/a Roddy Ricch ("Ricch") is a California resident and is a songwriter and performer of THE BOX.

4.      Defendant Samuel Gloade p/k/a/ 30 Roc ("Gloade") is upon information and belief a Georgia resident and a songwriter of THE BOX.

5.      Defendant Lamar Adarius Moragne ("Moragne") is upon information and belief a Georgia resident and a songwriter of THE BOX.

6.      Defendant Aqeel Qadir Tate ("Tate") is upon information and belief a Washington D.C. resident and a songwriter of THE BOX.

7.      Defendant Khirye Tyler ("Tyler") is upon information and belief an Ohio resident and a songwriter of THE BOX.

8.      Defendant Larrance Levar Dopson ("Dopson") is upon information and belief a resident of California and a songwriter of THE BOX.

9.      Defendant Blue Nike Publishing LLC ("Blue Nike") is a California Limited Liability Company with its principal place of business located at 31600 Railroad Canyon Rd., Suite A-111, Canyon Lake, California 92587.  Upon information and belief, Blue Nike is affiliated

with PeerMusic, III, Ltd. which maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019.

10.     Defendant PeerMusic, III, Ltd. ("PeerMusic") is a Delaware Corporation with its principal place of business located at 2397 Shattuck Ave., Berkley, California 94704.  Upon information and belief, PeerMusic maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019.

11.     Defendant Kobalt Music Publishing America, Inc. ("Kobalt") is a Delaware Corporation with its principal place of business located at 2 Gansevoort Street, 6th Floor, New York, New York 10014.

12.     Defendant Volume Ventures Publishing, LLC ("Volume Ventures") is upon information and belief a Delaware Corporation with a principal place of business at 251 Little Falls Dr., Wilmington, Delaware 19808.  Upon information and belief, Volume Ventures is affiliated with PeerMusic, III, Ltd. which maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019.

13.     Defendant Warner-Tamerlane Publishing Corp. ("Warner") is a California Corporation with a principal place of business located at 10585 Santa Monica Blvd., Los Angeles, California 90025.  Upon information and belief, Warner-Tamerlane is a wholly owned subsidiary of Warner Music Group, which maintains offices at 1740 Broadway, New York, New York 10019.

14.     Defendant Atlantic Recording Corporation d/b/a Atlantic ("Atlantic") is a Delaware corporation with its principal place of business located at 1633 Broadway, New York, New York 10019.  Upon information and belief, Atlantic is a wholly owned subsidiary of Warner Music Group Corporation, which maintains offices at 1740 Broadway, New York, New York 10019.

3

## JURISDICTION AND VENUE

15.     The jurisdiction of this Court with respect to the copyright infringement claims is based upon 28 U.S.C. §§ 1331 and 1338(a) in that the controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

16.     This Court has personal jurisdiction over the Defendants because certain Defendants reside in New York and all Defendants have directed their activities and marketing of the Infringing Work to New York residents, who are able to purchase, download, and stream the infringing song.  As such, the Defendants have engaged in continuing business activities in this jurisdiction.

17.     The Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

18.     Upon information and belief, the Defendants, individually and collectively, have generated substantial revenue from the exploitation of the Infringing Work in New York.

19.     New York has a considerable interest in adjudicating disputes wherein New York citizens are the target of the harm resulting from exploitation of the Infringing Work

20.     This Court has general personal jurisdiction over the individual Defendants, who reside or are essentially at home in the Judicial District, and the Corporate Defendants, who are incorporated or have their principal place of business in New York.

21.     This Court has specific personal jurisdiction over Defendants given systematic and continuous business contacts of both corporate and individual Defendants with respect to the Infringing Work, evidenced by the connections discussed herein, which, collectively, demonstrate purposeful availment, and show that this Court has jurisdiction over all Defendants.

22.     Additionally, the business entity Defendants are all affiliated with music publishers

that maintain offices in New York City and employ New York residents or have their own offices in New York City and employ New York residents. These Defendants are publishers of the Infringing Work and have knowingly and intentionally licensed and distributed, or authorized the licensing and distribution of, the Infringing Work in New York to New York companies in which these Defendants receive income and royalties for their interest in the Infringing Work based on sales, downloads, streams and other income producing activities by New York residents.

23.     This Court has general and specific personal jurisdiction over Defendant PeerMusic because, upon information and belief, it has continuous and systemic contacts with the State of New York to render it essentially at home in New York. Specifically, PeerMusic maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019 where it employs New York residents.

24.     This Court has specific jurisdiction over Volume Ventures because, upon information and belief, it is affiliated with PeerMusic, which maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019 where it employs New York residents.

25.     This Court has general and specific jurisdiction over Defendant Warner because it is a wholly owned subsidiary of Warner Music Group Corporation, which maintains offices at 1740 Broadway, New York, New York 10019 where it employees New York residents.

26.     This Court has general and specific jurisdiction over Defendant Kobalt because it has its principal place of business located at 2 Gansevoort Street, 6th Floor, New York, New York 10014 where it employs New York residents.

27.     This Court has general and specific jurisdiction over Defendant Atlantic Recording because its principal place of business located at 1633 Broadway, New York, New York 10019 and because it is a wholly owned subsidiary of Warner Music Group Corporation, which maintains offices at 1740 Broadway, New York, New York 10019. Atlantic is a record label responsible for

coordinating, among other things, the production, manufacture, distribution, marketing, and promotion of the Infringing Work in the United States.  Atlantic has sold, and benefited from the sale of, the Infringing Work in New York.  Upon information and belief, Atlantic conducts systematic and continuous business in this District, and has generated substantial revenue from exploitation of the Infringing Work in New York.

28.     This Court has specific jurisdiction over Defendant Ricch because, upon information and belief, he has licensed and/or authorized the licensing, distribution, and sale of the Infringing Work to New York companies and residents of New York and within this Judicial District; and has directly advertised or authorized others to advertise the Infringing Work through New York companies and to New York residents and has generated substantial revenues from performing the Infringing Work and selling the Infringing Work in the State of New York and in this Judicial District.  Upon information and belief, Defendant Ricch performed the Infringing Work at Madison Square Garden, New York, New York on October 13, 2022.  He performed the Infringing Work at Citi Field Rolling Loud New York, New York on or about October 30, 2021.

29.     Additionally, this Court has specific jurisdiction over Defendant Ricch because, upon information and belief, he is affiliated with Songs of Kobalt Music Publishing as his music publisher which has its principal place of business at 2 Gansevoort St., 6th Floor, New York, New York 10014.

30.     Additionally, this Court has specific jurisdiction over Defendant Ricch because, upon information and belief, he is signed with Performing Rights Organization Global Music Rights, LLC ("GMR"), which upon information and belief is a Delaware limited liability company doing business in New York at 28 Liberty Street, New York, New York 10005.

31.     Additionally, this Court has specific jurisdiction over Defendants Ricch because, upon information and belief, Defendant Ricch was previously affiliated with Broadcast Music Inc. ("BMI"),

which, upon information and belief, at relevant times directed its actions on Defendant Ricch's behalf in New York. BMI is a Delaware Corporation with its headquarters located at 7 World Trade Center, 250 Greenwich Street, New York, New York.

32.     Additionally, this Court has specific jurisdiction over Defendants Gloade, Morangne, Tate and Dopson because, upon information and belief, these Defendants are affiliated with Performing Rights Organization, Broadcast Music Inc. ("BMI"), which, upon information and belief, directs its actions on Defendant Gloade, Morangne and Tate's behalf in New York. BMI is a Delaware Corporation with its headquarters located at 7 World Trade Center, 250 Greenwich Street, New York, New York.

33.     Additionally, this Court has specific jurisdiction over Defendants Gloade, Morange, Tate and Tyler because, upon information and belief, they are represented by Warner Tamarlane Publishing Corp. which is a wholly owned subsidiary of Warner Music Group Corporation, which maintains offices at 1740 Broadway, New York, New York 10019.

34.     This Court has specific jurisdiction over Defendant Dopson because, upon information and belief, he is affiliated with PeerMusic which maintains offices at 152 W 57th St., 10th Floor, New York, New York 10019.

35.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a), in that the claims arise in this Judicial District, where Defendants regularly conduct business and may be found.

## FACTUAL ALLEGATIONS

36.     This is an action for copyright infringement, in violation of 17 U.S.C. §§ 101 *et seq.*, arising from the Defendants' unauthorized reproduction, distribution, and/or public

performance of the Plaintiff's copyrighted musical composition "COME ON DOWN" within the hit song "THE BOX", written by the Songwriter Defendants.

37.     Plaintiff is the legal and beneficial owner of the composition in the Original Work, COME ON DOWN, which has been registered with the United States Copyright Office as identified by Copyright Registration Number, Pau000028799.

38.     The musical composition for COME ON DOWN was co-written by Greg Perry, Katie Davis and Mallory Cowart.  Greg Perry, the former owner of Peabody & Company, recorded the master recording embodying the musical composition.

### The Timing and Opportunity Support Infringement

39.     COME ON DOWN was released in 1975 by Casablanca Records and published by Peabody & Company.

40.     It was an immediate hit and peaked at #24 on the R&B charts.

41.     COME ON DOWN was also widely disseminated across the R&B musical landscape.

42.     The long lasting popularity of COME ON DOWN has continued over the years and has been widely disseminated and popular in the rap community for many years.

43.     In 2008, Plaintiff licensed COME ON DOWN to Island Def Jam Music Group for use in the Young Jeezy song "WORDPLAY".  (Exhibit A: Wordplay License). Plaintiff was granted an advance and sixty percent (60%) interest in the copyright of the Young Jeezy Composition for WORDPLAY.

44.     In 2016, Plaintiff licensed a sample of COME ON DOWN to Epic Records for use in the Yo Gotti song "I REMEMBER".  (Exhibit B: I REMEMBER License). Plaintiff was granted an advance and an undivided fifty percent (50%) interest in the composition for I REMEMBER.

The copyright registration for "I REMEMBER" confirms it contains Pre-existing Material and elements from "COME ON DOWN" written and performed by Greg Perry.  (Exhibit C: Copyright Registration for "I REMEMBER").

45.     The use of the distinctive compositional elements of COME ON DOWN have remained so popular in both the R&B and Rap Community that access to the composition is firmly established.

## THE BOX is a Commercial Success

46.     On or about December 6, 2019, THE BOX was released by Atlantic Records.

47.     Defendants are the authors, creators, and the legal and beneficial owners of the composition in the Infringing Work, THE BOX, which has been registered with the United States Copyright Office as identified by Copyright Registration Numbers, PA0002246250 and PA0002307885.

48.     Defendant Atlantic Records is the claimed owner of the sound recording of THE BOX, as identified by Copyright Registration Number SR0000934079.

49.     Upon information and belief, THE BOX is a substantial commercial success.  It has spent several weeks across numerous hit music charts, including reaching No. 1 on the Billboard Hot 100.

50.     THE BOX spent eleven weeks at number one on the US Billboard Hot 100, as well as toping the charts in Canada, New Zealand, Hungary, and peaking at number two in both the UK and Ireland.

51.     Moreover, upon information and belief, the international success of THE BOX has led to several subsequent remixes of the song being made by other artists.

52.     Upon information and belief, THE BOX has to this date garnered millions of streams on the internet streaming service "Spotify".

53.     An official music video of the song was released on February 28, 2020.  The video has over 11 million views on YouTube as of November 18, 2022.  Other video versions have garnered substantial views and revenue for Defendants as well.

54.     The song has also been viewed over 6.5 billion times and used in more than 2.4 million videos on "TikTok".

55.     Upon information and belief, THE BOX has already earned a substantial amount of revenues in royalties and other means, and continues to generate such revenue.

56.     THE BOX was the biggest selling song of the final half of 2019, selling 4.7 million equivalent units as of July 2, 2020.

57.     Apple Music named THE BOX as Song of the Year.

58.     The BOX received three nominations at the 63rd Annual Grammy awards, including for Song of the Year.

59.     THE BOX has become a huge commercial success and has generated (and continues to generate) substantial amounts of royalties.

### Musicological Analysis of COME ON DOWN and THE BOX Demonstrates Clear Infringement

60.     By every method of analysis, THE BOX contains a complete duplication of certain compositional elements of Plaintiffs' Original Work taken directly from Plaintiff.  Plaintiff was formerly owned by Greg Perry who wrote, recorded, and published the earlier, identical Original Work COME ON DOWN.

61.     Comparative analysis of the beat, lyrics, hook, rhythmic structure, metrical placement, and narrative context by a musicology expert demonstrates clearly and convincingly

that THE BOX is an unauthorized duplication and infringement of certain elements of COME ON DOWN.

62.     THE BOX is so substantially similar to COME ON DOWN that ordinary observers would accurately perceive that the two songs sound the same, which they do.  THE BOX and COME ON DOWN both contain substantially similar defining compositional elements, including, without limitation, substantial similarities in melody, form, structure, and function. The songs' substantial similarities reach the very essence of each work.

63.     In fact, internet research shows numerous observers commenting on the similarities between the two songs. As an example, one YouTube commentator has stated "there's definitely some similarities".  See https://www.youtube.com/watch?v=tbYmd8Tkc4o

64.     Other rap artists have sought licenses and granted proper copyright interest to Plaintiff to record substantially similar features and musical elements of the musical composition COME ON DOWN in their songs.

65.     Plaintiff maintains a copyright interest in those musical compositions. Specifically, Plaintiff maintains a copyright interest in the musical composition of the song "WORDPLAY" as performed by Young Jeezy, released in 2008, with copyright registration number SR0000616586 and Plaintiff maintains a copyright interest in the musical composition "I REMEMBER" as performed by Yo Gotti, released in 2016, with a copyright registration number of PA0002299093 for the composition and SR0000818966 for the sound recording.

66.     Both of these compositions and recordings utilized similar if not identical elements of COME ON DOWN as the Infringing Work does.  Both works were pre-existing as of the date of the release of THE BOX and provide further evidence of access, originality, substantial similarity and copying of COME ON DOWN by Defendants.

67.     Plaintiff contends that substantial portions of COME ON DOWN were used by Defendants to create an unauthorized duplication of COME ON DOWN so that Defendants have infringed Plaintiff's copyrights interests in the three recordings.

68.     First, a lay person listening to both songs, particularly the musical elements at issue, can hear the strikingly similar (and, at times, identical) tempo and melody and substantially similar musical elements of the two songs.

69.     However, music can be analyzed scientifically as well through musicological research and analysis to determine whether infringement occurred.

70.     Musicology analysis confirms that portions of COME ON DOWN are distinct, unique and original and the elements copied by Defendants in THE BOX are substantially similar when reviewing through a comparative analysis of the two songs.

71.     Other Defendants in the rap world that have chosen to copy elements of COME ON DOWN have done so legally and correctly by licensing the musical composition, granting Peabody & Company its proper copyright interest, and paying royalties.  The comparative analysis of these two songs (I REMEMBER and WORDPLAY), which copied the same musical elements, but properly licensed the musical composition establishes the protectable musical elements from COME ON DOWN are sufficiently original for copyright protection.

72.     Defendants chose not to license the musical composition from Plaintiff and instead chose to intentionally infringe upon the copyright.

## EXPERT MUSICOLOGY ANALYSIS

73.     Expert musicology analysis confirms that the unique and distinct musical elements from COME ON DOWN constitute an original musical arrangement and chord progression that is copied repeatedly throughout THE BOX.

74.     Expert musicology analysis definitively confirms the substantial similarity between the copied musical elements from COME ON DOWN that were utilized in THE BOX.

75.     Furthermore, the fact that the same musical elements that were copied in THE BOX from COME ON DOWN were also copied in I REMEMBER and WORDPLAY further establishes that the musical elements from COME ON DOWN are sufficiently original to deserve copyright protection, especially considering the same musical elements and musical arrangement were copied from COME ON DOWN in all three songs.

76.     Expert musicology analysis confirms that the distinctive chord progression repeats 18 times during the recording of COME ON DOWN and 32 times in the recording of THE BOX.

77.     Detailed Musicology analysis further confirms the following

### The Six Significant Similarities

78.     The analyses have identified six significant similarities between "COME ON DOWN" and "THE BOX."

**a.     Both songs contain nearly identical instrumental melodies.**

The principal instrumental melodic lines of both songs are almost identical.

"COME ON DOWN" and "THE BOX" both use a distinct melodic instrumental line which has been created from an A flat minor scale.

These lines are performed in both songs by a violin section or a rendition of a violin by a synthesizer and are repeated throughout both recordings.

**b.     The chord progressions of both songs are practically identical.**

Both songs use a unique chord progression which repeats throughout both recordings.

"COME ON DOWN" is based upon an Ab minor chord which alternates with a Gb major chord, while "THE BOX" contains the same progression but features the insertion of an E chord between the Ab minor and the G flat.  This added chord is known as a "passing" chord.

**c.      Both chord progressions repeat throughout both songs.**

The chord progression in "COME ON DOWN" repeats 18 times during the course of the recording and the chord progression in "THE BOX" repeats 32 times.

"COME ON DOWN" is recorded at the tempo of 96 bpm and THE BOX" is recorded at 58 bpm and both songs are approximately of the same length.

The repetition of this chord progression in both songs is significant since both songs are approximately the same in length, although they are performed at different tempos.

"COME ON DOWN" is 3:32 long and "THE BOX" is 3:16 long. Since both songs are of approximately the same duration, but "THE BOX" is slower than "COME ON DOWN", this results in the chord progression in "THE BOX" being repeated almost twice as much as the chord progression in "COME ON DOWN."

The constant repetition of the chord progression of "COME ON DOWN", which is replicated in "THE BOX" and which permeates the recording of "THE BOX" demonstrates its viability in "COME ON DOWN" and also its originality.

**d.      The instrumentation of both songs is very similar.**

Both songs are performed by similar instrumental ensembles. In "COME ON DOWN," the sounds are produced by acoustic instruments and in "THE BOX", these same sounds are generated by computers and synthesizers.

The instrumental grouping or ensemble of both songs is comprised of:

- A violin section or a synthesizer rendition of a violin section.
- A synthesizer keyboard.
- An electric bass or a synthesizer rendition of an electric bass.
- A drum set or a drum machine rendition of a drum set.

**e.      The instrumental arrangements of both songs contain marked similarities.**

As part of the musical arrangements of both songs, they both contain an introductory passage that introduces the same musical elements in the same order.

Expert musicology analysis and opinion believes that this occurrence in both songs cannot have occurred randomly or by chance but occurs by design and its appearance in "THE BOX" means that it was copied from "COME ON DOWN" and presents evidence of premeditated plagiarism.

14

The entrances of similar musical elements occur in the same way and in the same order, which is as follows:

(1) – The instrumental melodic line is performed and repeated.
(2) – The synthesizer keyboard enters.
(3) – The vocalist enters.
(4) – The bass and drums enter.

**f.      The tone settings on all the instruments in the ensemble is strikingly similar.**

This is especially evident in the violin sounds used in both songs and the synthesizer sound of the keyboard in "THE BOX" that replicates the sound of the electric keyboard in "COME ON DOWN."

79.     These six similarities are depicted in a series of exhibits below.

## A Reductive Analysis of COME ON DOWN

80.     A Reductive Analysis of COME ON DOWN confirms that both songs contain a nearly identical instrumental melody. The signature instrumental melodic figure in "COME ON DOWN" appears first in the beginning of the song.  A section of violins performs this gesture as a solo, which causes it to stand out and immediately grabs the listener's attention.

81.     This signature gesture unfolds as follows:

•       The violins play a low Ab, which sounds at the bottom of the range of the violin.

•       Then, the string section rapidly slides up the scale to the same note an octave above. This is known as a glissando.

•       This high Ab is then sustained by a rapid, alternating bowing technique known as a tremolando.

These series of events are identified in the exhibit below:

**Circle 1** - identifies the low Ab, the first musical event to occur in both songs.

The upwardly reaching line that appears between the two notes identifies the glissando, or the rapidly "sliding" up the Ab minor scale, the second musical event that occurs in both songs.

**Circle 2** - identifies the arrival at the high Ab an octave above, the third musical event that occurs in both songs.

The five dashes that appear above the high Ab represent the musical direction to perform a tremolando, which is a rapid alternating stroke of the violin bow on a single note.

The "bird's eye" figure above that is the musical direction to sustain the note for an indeterminant amount of time before moving on and is known as a fermata.

82.     There are substantially similar musical arrangements of the introductory passages of both songs. The unique musical elements depicted below, and which occur in the same order in both songs, demonstrate the originality of their use in "COME ON DOWN" and that they were copied in "THE BOX."

83.     The following musical gestures, identified by circled numbers 3 through 7, occur in the same sequence in both songs, and represent the next musical events that occur in both songs.

84.      This constitutes a significant similarity in the musical arrangements of "COME ON DOWN" and "THE BOX."

85.     The sequence of events in the opening bars of "COME ON DOWN" and "THE BOX."

**Circle 3** - identifies the musical event that occurs in both songs after the opening glissando (identified above by circle 2), the sounding of an Ab minor chord by a violin section in "COME ON DOWN" and by a synthesizer in "THE BOX."

**Circle 4** - identifies the next musical event that occurs, a rapid figure played by the snare drum that precedes the entrance of the full drum set in the following bar.

**Circle 5** – identifies the next musical event that occurs, the entrance of the synthesizer keyboard on an Ab minor chord that begins an 8-bar instrumental introduction before the first vocal entrance.

**Circle 6** - identifies a repetition of the opening glissando gesture.

**Circle 7** - identifies the first vocal entrance on the lyric: "COME ON DOWN." This is immediately followed by the beginning of the central chord progression of the song, an alternation between an Ab minor chord and a Gb major chord.  These two chords repeat throughout the remainder of the recording.

### Exhibit 1: "COME ON DOWN"







## A Reductive Analysis of THE BOX

86.    A Reductive Analysis of "THE BOX" was conducted and confirms the following.

87.    Exhibit 2 is a depiction of the musical score of "THE BOX".  It identifies musical gestures that are very similar to those found in "COME ON DOWN", which are depicted above in Exhibit 1.

88.    Exhibit 2 also identifies a succession of events that occur at the opening of the song, which are closely linked to those found in "COME ON DOWN" (depicted in Exhibit 1 by the circled numbers 1 through 7), which identifies the fact that the musical arrangements of the songs are very similar.

Circle 1 - identifies the low Ab that begins the same glissando gesture that is found in "COME ON DOWN."

Circle 2 – identifies the ascension of the violins (played here by a synthesizer) to the high Ab an octave above. This glissando gesture is repeated throughout the recording every few bars.

Circle 3 - identifies the entrance of the first Ab minor chord (played here by a synthesizer) in a similar way that this gesture occurs in "COME ON DOWN."

Circle 4 – identifies the first vocal entrance on the words: "Pullin' out the coupe at the lot," which occurs in a similar way as the first vocal entrance that appears in "COME ON DOWN."

**Circle 5** – identifies the entrance of the drums immediately after the first vocal entrance, in way that is similar to the drum entrance in "COME ON DOWN."

**Circle 6** – identifies the entrance of a Gb major chord.  The chord progression of Ab minor followed by Gb major repeats throughout the remainder of the recording in the same way that these two chords repeat in "COME ON DOWN."  The only difference is that "THE BOX" chord progression includes a "passing chord", which is a harmonic device in music that facilitates a transition from one chord to another.   In this case, an E major chord is inserted between the Ab minor and the G flat major.

### Exhibit 2 – "THE BOX"





### An Ancillary Analysis of "I REMEMBER" and "WORDPLAY"

89.   An Ancillary Analysis of "I REMEMBER" and "Word Play" was also conducted.

90.     The recordings of these two songs have also been analyzed.  Both were recorded and published after "COME ON DOWN" and both composers licensed the compositional musical elements of "COME ON DOWN" and used edited versions of it in their respective compositions.

91.     After analyzing these two songs using the methodology of Recording Analysis, it appears that the original instrumental tracks from "COME ON DOWN" have been used (or sampled) from the original recording of "COME ON DOWN."

92.     These analyses are included in this report to establish the following:

•       The licensing of "COME ON DOWN" and its subsequent use in composing and producing the recordings of "I REMEMBER" and "Word Play" is an indication that "COME ON DOWN" is an iconic part of the musical culture from the period when it was released, and, as such, establishes its originality.

        Its use as the template for the composition and production of "I REMEMBER" and "WORDPLAY" constitutes an homage to Mr. Perry's music, and an indication that the instrumental track of "COME ON DOWN" would be recognized by the audience that the composers of "I REMEMBER" and "Word Play" hope to attract.

•       The legitimate licensing and use of "COME ON DOWN" in "I REMEMBER" and Word Play" also supports the allegation that the composer of "THE BOX" had ample access to "COME ON DOWN" and invokes the inverse ratio rule.

93.     Exhibits 4 and 5 are Reductive Analyses of the musical scores of "I REMEMBER" and "Word Play", two recordings that feature major musical elements taken from "COME ON DOWN."  The circled numbers in the following exhibits correspond to the numbered events in Exhibits 1 and 2 of "COME ON DOWN" and "THE BOX."

94.     As can be seen, the key signatures are the same and the signature musical gestures (repeated glissandos, musical arrangements, chord progressions, etc.) appear in "I REMEMBER" and "Word Play" in similar ways as they appear in "COME ON DOWN."

**Exhibit 4 – A Reductive Analysis of "I REMEMBER"**





**Exhibit 5 - A Reductive Analysis of "WORDPLAY"**





95. Ultimately, expert musicology analysis confirms the following conclusions:

96. An analysis of the recordings of "COME ON DOWN" and "THE BOX" has been

undertaken using the methodologies of: Recording Analysis and Compositional (Reductive)

Analysis. These analyses have identified six striking similarities that obtain in both songs:

**a.      Both songs contain nearly identical instrumental melodies.**

Both songs make extensive use of the same unique melodic gesture, a glissando in the
strings or synthesizer from low Ab to Ab an octave higher. This gesture appears more
frequently in "THE BOX" than it does in "COME ON DOWN."

22

**b.      The chord progressions of both songs are practically identical.**

Also, both songs are based on a unique chord progression which is repeated throughout both songs and which comprises the totality of the harmonic basis of both songs.

 In "COME ON DOWN" it is Ab minor to Gb.   In "THE BOX", the chord progression also includes the insertion of an E major chord, which is used as a "passing chord" in between Ab minor and Gb.

**c.      Both chord progressions repeat throughout both songs.**

The chord progression is repeated 18 times in "COME ON DOWN".  The chord progression in "THE BOX" is repeated 32 times. Since this chord progression constitutes the totality of the harmonic basis for both songs and permeates the box, this is an indication of its originality and that it originated in "COME ON DOWN" and constitutes copying of the overall theme of "COME ON DOWN" by "THE BOX".

**d.      The instrumentation of both songs is very similar.**

Both songs are performed by similar instrumental ensembles:

- A repeated gesture is played by violins in "COME ON DOWN" and by a synthesizer using a violin program in "THE BOX."
- A keyboard or synthesizer provides the chord progression.
- Drums provide a repetitive beat throughout. In "COME ON DOWN", the part is played by real drums and in "THE BOX" it is played by a drum machine.

**e.      The instrumental arrangements of both songs contain marked similarities.**

Both songs feature an introduction in which several of the same musical elements are introduced into the recording in a similar sequential order.  These introductions are analyzed in Exhibits 1 and 2.

As part of the musical arrangements of both songs, they both contain an introductory passage that introduces the same musical elements in the same order. Expert musicology analysis provides the opinion that this occurrence in both songs cannot have occurred randomly or by chance but occurs by design and its appearance in "THE BOX" means that it was copied from "COME ON DOWN" and presents evidence of premeditated plagiarism.

**f.      The tone settings of all the instruments in the ensembles is strikingly similar.**

"COME ON DOWN" uses acoustic instruments, while "THE BOX" uses computer generated instruments that imitate the sound of these same acoustic instruments.

Expert musicology analysis provides the opinion that the similarities identified in this study have not occurred by chance or by coincidence.  Therefore, they must have occurred by design.  Since "COME ON DOWN" was the first of the two songs to be copyrighted, it appears as if significant aspects of Mr. Perry's musical material and ideas which appear in "COME ON DOWN" have been appropriated by the composer and producers of the recording of "THE BOX" and have been incorporated into the composition and recording of that song.

97.     For these reasons, and as further provided herein, Defendants have infringed upon the copyrights of Plaintiff; Defendants have unlawfully exploited COME ON DOWN; Defendants have deceived and/or confused the public into thinking that THE BOX is the independent creation of Defendants. And in doing so, Defendants have, with actual knowledge and intent, caused serious and significant injury to Plaintiff.

**FIRST CAUSE OF ACTION**
**DIRECT, CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGMENT IN VIOLATION OF 17 U.S.C. § 101, *et seq***
**(AGAINST ALL DEFENDANTS)**

98.     Plaintiff re-alleges each and every fact set forth in the preceding Paragraphs of the Complaint as if they were fully set forth herein.

99.     The Original Work is properly registered with the United States Copyright Office. Plaintiff are the legal and beneficial owner of the United States copyright in all rights, title, and interests of the musical composition of the Original Work.

100.     Defendants had access to the Original Work (as discussed above). Furthermore, Plaintiff's Original Work and Defendants' Infringing Work are strikingly similar, such that access is presumed by not only ordinary listeners, but by expert musicology analysis.

101.     Collectively, Defendants released, manufactured, distributed, licensed, and marketed the Infringing Work.

102.    Defendants' unauthorized reproduction, distribution, public performance, display and creation of a derivative work, the Infringing Work, infringes Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 101 *et seq*.

103.    Defendants did not seek or receive permission to copy or interpolate any portion of the Original Work into the Infringing Work. Despite the lack of permission, and in blatant disregard for Plaintiff's rights, Defendants unlawfully copied qualitatively and quantitatively important portions of the Original Work into the Infringing Work.

104.    Defendants' conduct has at all times been knowing, willful, and with complete disregard to Plaintiffs' rights.

105.    As a proximate cause of Defendants' wrongful conduct, Plaintiff has been irreparably harmed.

106.    The Infringing Work copy quantitatively and qualitatively distinct, important, unique, and recognizable portions of the Original Work.  The copied materials are also qualitatively and quantitatively important to the Infringing Work, and recognizable to the ordinary observer.

107.    From the date of the creation of the Infringing Work, all of Defendants have infringed Plaintiff's copyright interest in the Original Work including: (a) by substantially copying and publicly performing, or authorizing the copying and public performances, including publicly performing the Infringing Work at radio, live concerts, personal appearances, and on video, television, and otherwise; (b) by authorizing the reproduction, distribution, and sale of the records and digital downloads through the execution of licenses, and/or actually selling, manufacturing, and/or distributing the Infringing Work through various sources; (c) by substantially copying and the related marketing and promotion of the sale of the records, videos, tickets to concerts and other

performances, and other merchandise; and (d) by participating in and furthering the aforementioned infringing acts, and/or sharing in the proceeds therefrom, all through substantial use of the Original Work in and as part of the Infringing Work packaged in a variety of configurations and digital downloads and performed in a variety of ways including radio, concerts, personal appearances, video, television, and/or otherwise.

108.    Plaintiff has received no copyright ownership in and for any of the exploitations of the Infringing Work.

109.    The infringement by Defendants has been, and continues to be, willful and knowing.

110.    Defendants have reproduced and/or distributed and continue to manufacture, reproduce and distribute large numbers of copies of the Infringing Work, which violate Plaintiff's copyrights and are at issue in this lawsuit. Defendants have granted, or caused to be granted to various parties, licenses to reproduce, sample and/or distribute the Infringing Work in violation of Plaintiff's copyrights.

111.    With knowledge of the infringement, Defendants have induced, caused, or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable.

112.    Defendants have the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that Defendants should be found to be vicariously liable.

113.    The infringement is continuing as the Infringing Work continue to be sold and licensed for sale, downloads, ringtones, mastertones, and other exploitations by Defendants, or their agents.

114. As a direct and proximate result of the conduct of the Defendants, Plaintiff has suffered actual damages including lost profits, lost opportunities, loss of goodwill, and lost publicity.

115. Pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to damages, including the substantial profits of Defendants, direct and indirect, as will be proven at trial.

116. Plaintiff is entitled to Defendants' profits relating to foreign sales of copies of the Infringing Work that were manufactured, distributed, or otherwise infringed domestically, to the extent a predicate act of infringement occurred in the United States.

117. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiff irreparable injury that cannot be fully compensated or measured in monetary terms. Plaintiff has no adequate remedy at law.

118. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction, following judgment, prohibiting the reproduction, distribution, sale, public performance, or other use or exploitation of the Infringing Work, or, in the alternative, a continuing royalty for each sale or license of the Infringing Work, or any money received by Defendants related thereto, following judgment, and related to any amount not taken into account in the Judgment, in an amount to be determined.

119. Defendants' reproduction, distribution, promotion and public performances of THE BOX continue to this day.

120. Defendants have neither requested permission nor compensated Plaintiff for the use of Plaintiff's copyrighted work, even though defendants received money and other substantial benefits from Plaintiff's song.

121.    Defendants' reproduction, distribution, and public performance of THE BOX, and their authorizing others to do the same, infringes Plaintiff's exclusive rights under the United States Copyright Act, 17 U.S.C. § 101, *et seq.*

122.    Defendants' conduct in infringing COME ON DOWN is knowing and willful.

123.    As a direct and/or proximate cause of Defendants' wrongful conduct, Plaintiff has been irreparably harmed, suffered (and continue to suffer) damages, and Defendants have profited in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A.    A declaration that Defendants have willfully infringed Plaintiff's copyrighted work in violation of the Copyright Act;

B.    A declaration that Defendants are directly, vicariously and/or contributorily liable for copyright infringement, as applicable;

C.    An award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, and the direct and indirect profits of Defendants as will be proven at trial;

D.    A permanent injunction requiring Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any one of them, to cease directly and indirectly infringing, and causing, enabling, facilitating, encouraging, promoting, inducing, and/or participating in the infringement of any of Plaintiffs' rights protected by the Copyright Act;

E.    If the Court determines a permanent injunction is not the appropriate remedy for the continued infringement of Plaintiff's rights under the Copyright Act, then pursuant to

precedent, Plaintiff be compensated by a running royalty paid on all exploitations the Infringing

Work commencing from the date of judgment and for all amounts not taken into consideration in

the judgment;

      F.      An award of attorneys' fees and costs;

      G.      Pre-judgment and post-judgment interest according to law, as applicable; and

      H.      For such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully

demands a trial by jury.

Dated: May 5, 2023

                        Respectfully submitted,

                        */s/  Joshua D. Wilson*
                        Joshua D. Wilson
                        **GORDON REES SCULLY MANSUKHANI, LLP**
                        One Battery Park Plaza, 28th Floor
                        New York, NY 10004
                        Telephone: 973-459-2532
                        Fax: 212-269-5505
                        jdwilson@grsm.com

                        *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2023, I electronically filed the FIRST AMENDED COMPLAINT With the Clerk of this Court using CM/ECF system which will automatically send e-mail notification of such filing to the following parties who are CM/ ECF participants:

Tal E. Dickstein
Alex Loh
Barry Slotnick
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407-4000
tdickstein@loeb.com
aloh@loeb.com
bslotnick@loeb.com

*Attorneys for Defendants*

*/s/ Joshua D. Wilson*
Joshua D. Wilson